**MBTA EMPLOYEES CREDIT UNION, Plaintiff,**

v.

**EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY OF WISCONSIN, Defendant.**

Civ. A. No. 73–2674–S.

United States District Court, D. Massachusetts.

April 29, 1974.

Hyman Katz, Boston, Mass., for plaintiff.

Robert W. Blakeney, Blakeney, Blakeney, Criss & Moran, Boston, Mass., for defendant.

### MEMORANDUM AND ORDER MOTION FOR SUMMA-RY JUDGMENT

SKINNER, District Judge.

The plaintiff has filed a Motion for Summary Judgment based upon an affidavit, the transcript of a deposition of an employee of State Street Trust Company, and Answers to Interrogatories. The defendant has filed an opposition thereto and a counter affidavit. The uncontroverted facts are as follows:

The plaintiff Credit Union issues checks on its own preprinted form. The check is made out with a check-writing machine which impresses the check with the amount and also the authorized facsimile signature of one of plaintiff's officers. At all times material hereto it had only one such machine. It has an agreement with State Street Bank and Trust Company (State Street), its depositary bank, under which State Street is authorized to pay checks impressed with said facsimile signatures. No specific form of check is prescribed. State Street requires no particular form of check from its customers and will honor any check which is properly signed and has imprinted on it the customer's account number.

If a check is notably different in style from those customarily used by a customer, or does not have the account number on it, the bank may inquire of the customer concerning the validity of the check, but is not required to do so and would not do so in every case.

On April 10, 1973, plaintiff discovered that certain persons had opened bank accounts in suburban banks with checks purporting to have been issued by plaintiff and made out to fictitious payees. These checks were presented in due course to State Street and paid, with a corresponding charge to plaintiff's ac-

count. Cash was then withdrawn from the fictitious accounts. A total of $45,500 was thus charged to plaintiff's account, of which $6,207.04 has been recovered from the fictitious accounts in the correspondent banks, and credited to the plaintiff's account. State Street has refused to credit the remaining $39,292.96 to the plaintiff's account, although the plaintiff has demanded such credit.

The false checks used to accomplish this scheme were identical in design with those used by plaintiff, except that they were printed on different paper. The false checks were imprinted with a check-writing machine, which also impressed a facsimile signature nearly identical to that used on plaintiff's checks. The dollar amount in the false check was printed all in red, and the cents were not underlined. The plaintiff's check-writer printed dollars in black and cents in red, and underlined the cents. The false checks were imprinted with serial numbers over 7,000, which serial numbers were higher than those reached by the plaintiff in March and April 1973.

Some of the persons responsible for the scheme described above have been apprehended and convicted in a state court, but it has not been established how, when, where or by whom the false checks were made.

The defendant had issued a "Credit Union Discovery Blanket Bond" ("the bond") to the plaintiff which was in force at all times material, with a limit of aggregate liability of $525,000. The coverage of the bond included the following:

"D. Direct loss caused by forgery or alteration of any instrument, including credit cards issued to the CREDIT UNION or for which the CREDIT UNION is legally liable for payment of incurred charges, negotiable or otherwise; [see exclusions (i), (j), (k) and (m)].

* * * * * *

"F. Direct loss caused by the acceptance by the CREDIT UNION in good faith in the regular course of business of counterfeit United States or Canadian currency or money orders; [see exclusions (i), (j), (k), and (m)]."

Certain losses were excluded from coverage under the bond, the only material one of which is exclusion (k), to wit:

"Exclusions

"This bond does not apply:

* * * * * *

(k) Except with respect to coverage G, to any indirect or consequential loss or damages, including loss of use or loss of earnings of PROPERTY."

Condition 3 of the policy provides in material part, as follows:

3. CREDIT UNION'S DUTIES WHEN LOSS IS DISCOVERED. Upon discovery of any loss which could result in a claim hereunder . . . the CREDIT UNION shall:

(a) give written notice thereof as soon as practicable to the company or to any of its authorized agents and, if the loss is due to a violation of law, also to the appropriate law enforcement agency.

(b) file a detailed proof of loss, duly sworn to, with the company within six months after giving such notice of loss.

On April 17, 1973 the plaintiff sent the following letter to the defendant with reference to the bond:

"Please be advised that a claim may arise on this bond due to Counterfeit checks."

The defendant replied on May 4, 1973, thanking the plaintiff for "advising us that a claim may arise due to counterfeit checks," and stating that the matter had been referred to its claim office in Belmont, Massachusetts for investigation.

On June 8, 1973, the plaintiff forwarded to the defendant a sworn proof of loss setting forth in substance the events described above. In all of the plaintiff's correspondence after April 17, 1973, the cause of the loss is described as "forgery" of checks.

The defendant opposes the plaintiff's Motion for Summary Judgment on three grounds:

(1) The letter of April 17, 1973 was insufficient notice because it referred to "counterfeit checks," and there is no coverage under the policy for "counterfeit checks."

(2) It is disputed as to whether the checks are counterfeit or forged.

(3) The loss suffered by the plaintiff was not directly caused by the false checks, but rather by the refusal of State Street to credit the plaintiff's account with the amounts charged against the false checks.

So much of the defendant's opposition as turns on the distinction between "forged" and counterfeit is unavailing. As applied to private checks, where no specific form is established by statute, rule or corporate vote, the distinction is meaningless. A check is an unconditional order drawn on a bank to pay money on demand. Mass.G.L. c. 106, Section 3–104. Bullard v. Randall, 67 Mass. 605 (1884). Its validity is dependent upon the genuineness of the signature. If the false checks had been impressed with the authorized facsimile signature, the checks would have been good, even though printed on different paper. The body of the check could have been written in blood on birch bark, for that matter, and if properly signed by authorized facsimile signature, would have been a good check. Conversely, an authorized form without an authorized signature stamp would have been invalid.

"Counterfeit" has no meaning in this context other than forged. In fact, at common law the words are virtually synonymous (at least with respect to documents other than currency). Commonwealth v. Ray, 69 Mass. 441. Forgery may be committed by the unauthorized use of a stamp or engraving plate. Commonwealth v. Ray, *supra*; Benson v. McMahon, 127 U.S. 457, 8 S.Ct. 1240, 32 L.Ed. 234 (1827).

The loss was consequently covered by insuring clause D of the bond and the notice of loss of April 17, 1973, therefore, contained a sufficient description of the loss.

The loss was directly caused by the presentation of forged checks at State Street. The plaintiff may have a right of action against State Street for negligent payment of the checks, but it is not obliged to enforce that right as a prerequisite to collecting on the bond, as defendant's counsel conceded at argument.

The plaintiff's Motion for Summary Judgment is allowed, and judgment is ordered for the plaintiff in the amount of $39,292.96 with interest from August 13, 1973, and costs.